1

2

3

4

5

6

7

8                          **UNITED STATES DISTRICT COURT**

9                          **EASTERN DISTRICT OF CALIFORNIA**

10

11   JASON R. PEZANT,                    )   Case No.: 1:11-cv-01819-LJO-JLT
                                          )
12           Petitioner,                  )   FINDINGS AND RECOMMENDATIONS TO
                                          )   GRANT IN PART AND DENY IN PART
13       v.                               )   RESPONDENT'S MOTION TO DISMISS
                                          )   (Doc. 12)
14   M. STAINER,                          )
                                          )   FINDINGS AND RECOMMENDATIONS TO
15           Respondent.                  )   DENY PETITION FOR WRIT OF HABEAS
                                          )   CORPUS (Doc. 1)
16                                        )
                                          )   ORDER DIRECTING THAT OBJECTIONS BE
17                                        )   FILED WITHIN TWENTY DAYS
                                          )
18   ─────────────────────────

19           Petitioner is a state prisoner proceeding in propria persona with a petition for writ of habeas

20   corpus pursuant to 28 U.S.C. § 2254.

21                          **PROCEDURAL HISTORY**

22           The instant petition was filed on November 1, 2011.  (Doc. 1).   On February 24, 2012,

23   Respondent filed the instant motion to dismiss, contending that the Court lacks habeas jurisdiction

24   over Petitioner's claims.  (Doc. 12).   On March 16, 2012, Petitioner filed his opposition to the motion

25   to dismiss.  (Doc. 16).

26   ///

27

28                                          1

**DISCUSSION**

A.  Procedural Grounds for Motion to Dismiss

As mentioned, Respondent has filed a Motion to Dismiss the petition for lack of jurisdiction. Rule 4 of the Rules Governing Section 2254 Cases allows a district court to dismiss a petition if it "plainly appears from the face of the petition and any exhibits annexed to it that the petitioner is not entitled to relief in the district court . . . ." Rule 4 of the Rules Governing Section 2254 Cases.

The Ninth Circuit has allowed Respondent's to file a Motion to Dismiss in lieu of an Answer if the motion attacks the pleadings for failing to exhaust state remedies or being in violation of the state's procedural rules. See, e.g., O'Bremski v. Maass, 915 F.2d 418, 420 (9th Cir. 1990) (using Rule 4 to evaluate motion to dismiss petition for failure to exhaust state remedies); White v. Lewis, 874 F.2d 599, 602-03 (9th Cir. 1989) (using Rule 4 as procedural grounds to review motion to dismiss for state procedural default); Hillery v. Pulley, 533 F.Supp. 1189, 1194 & n.12 (E.D. Cal. 1982) (same).  Thus, a Respondent can file a Motion to Dismiss after the court orders a response, and the Court should use Rule 4 standards to review the motion.  See Hillery, 533 F. Supp. at 1194 & n. 12.

In this case, Respondent's Motion to Dismiss is based on the contention that the Court lacks jurisdiction over the habeas petition.  Because Respondent's Motion to Dismiss is similar in procedural standing to a Motion to Dismiss for failure to exhaust state remedies or for state procedural default and Respondent has not yet filed a formal Answer, the Court will review Respondent's Motion to Dismiss pursuant to its authority under Rule 4.

B.  Habeas Jurisdiction Exists To Review Petitioner's Claims.

1.  General Principles of Habeas Jurisdiction.

A federal court may only grant a petition for writ of habeas corpus if the petitioner can show that "he is in custody in violation of the Constitution . . . ."  28 U.S.C. § 2254(a).  A habeas corpus petition is the correct method for a prisoner to challenge the "legality or duration" of his confinement. Badea v. Cox, 931 F.2d 573, 574 (9th Cir. 1991), quoting, Preiser v. Rodriguez, 411 U.S. 475, 485, 93 S. Ct. 1827 (1973); Ramirez v. Galaza, 334 F.3d 850, 859 (9th Cir. 2003)("[H]abeas jurisdiction is

absent, and a § 1983 action proper, where a successful challenge to a prison condition will not

necessarily shorten the prisoner's sentence."); Advisory Committee Notes to Rule 1 of the Rules

Governing Section 2254 Cases.   Indeed, claims challenging the validity of a prisoner's continued

incarceration, including the fact or length of the custody, lie within the "heart of habeas corpus" and

are cognizable only in federal habeas corpus.  Preiser v. Rodriguez, 411 U.S. 475, 498-99, 499 n.14

(1973).  In contrast, an action pursuant to 42 U.S.C. § 1983 is appropriate for a state prisoner

challenging the conditions of prison life but not the fact or length of the custody.  McCarthy v.

Bronson, 500 U.S. 136, 141-42 (1991);   Preiser v. Rodriguez, 411 U.S. at 499; Badea v. Cox, 931

F.2d 573, 574 (9th Cir. 1991).

   With respect to prison disciplinary proceedings, it is established that a constitutional claim

concerning the application of rules administered by a prison or penal administrator that challenges the

duration of a sentence is a cognizable claim of being in custody in violation of the Constitution

pursuant to 28 U.S.C. § 2254.  See, e.g., Superintendent v. Hill, 472 U.S. 445, 454 (1985)

(determining a procedural due process claim concerning loss of time credits resulting from

disciplinary procedures and findings).  The Supreme Court has held that challenges to prison

disciplinary adjudications that have resulted in a loss of time credits must be raised in a federal habeas

corpus action and not in a § 1983 action because such a challenge is to the very fact or duration of

physical imprisonment, and the relief sought is a determination of entitlement of immediate or

speedier release.  Preiser v. Rodriguez, 411 U.S. 475, 500.

   The Supreme Court's decisions concerning any boundaries between habeas jurisdiction and §

1983 jurisdiction have been rendered in cases involving § 1983 proceedings.  Thus, it is established

that regardless of the precise relief sought, an action pursuant to § 1983 concerning prison

administrative processes is barred if success in the action would necessarily demonstrate the invalidity

of the confinement or its duration, or necessarily imply the invalidity of a conviction or sentence.

Wilkinson v. Dotson, 544 U.S. 74, 81-82 (2005) (parole processes).  However, the limits on habeas

jurisdiction, or the appropriate extent of any overlap between habeas and § 1983, has not been

3

definitively addressed by the Supreme Court.  The Supreme Court has referred to the possibility of habeas as a potential alternative remedy to an action under § 1983 for unspecified additional and unconstitutional restraints during lawful custody,  Preiser v. Rodriguez, 411 U.S. at 499-500, but it has declined to address whether a writ of habeas corpus may be used to challenge conditions of confinement as distinct from the fact or length of confinement itself, see Bell v. Wolfish, 441 U.S. 520, 527 n.6 (1979).  Nevertheless, the Court continues to recognize a "core" of habeas corpus jurisdiction that refers to suits where success would inevitably affect the legality or duration of confinement.  For example, in Wilkinson, the Court noted that if success on a claim would mean at most a new opportunity for review of parole eligibility, or a new parole hearing at which authorities could discretionarily decline to shorten a prison term, then success would not inevitably lead to release, and the suit would not lie at the core of habeas corpus.  Wilkinson, 544 U.S. at 82.

In the singular context of parole, cases in this circuit have recognized a possibility of habeas jurisdiction in suits that do not fall within the core of habeas corpus.  Bostic v. Carlson, 884 F.3d 1267 (9th Cir. 1989) (expungement of disciplinary finding likely to accelerate eligibility for parole)[1]; Docken v. Chase, 393 F.3d 1024 (9th Cir. 2004) (a claim challenging the constitutionality of the frequency of parole reviews, where the prisoner was seeking only equitable relief, was held sufficiently related to the duration of confinement).  However, relief pursuant to § 1983 remains an appropriate remedy for claims concerning administrative decisions made in prison where success would not necessarily imply the validity of continuing confinement.  Docken v. Chase, 393 F.3d at 1030 (characterizing Neal v. Shimoda, 131 F.3d 818 (9th Cir. 1997) as holding that a § 1983 suit is an appropriate remedy for challenges to conditions [there, administrative placement in a sex offender program affecting eligibility for parole] which do not necessarily imply the invalidity of continuing confinement).

Nevertheless, it is established in this circuit that where a successful challenge to a disciplinary

---

[1] The Court notes that Bostic involved a suit pursuant to 28 U.S.C. § 2241, not § 2254.

4

hearing or administrative sanction will not necessarily shorten the overall length of confinement, then habeas jurisdiction is lacking.  In Ramirez v. Galaza, 334 F.3d 850 (9th Cir. 2003), a prisoner sought relief pursuant to § 1983 for allegedly unconstitutional disciplinary proceedings that resulted in administrative segregation.  It was held that § 1983 was the appropriate remedy because the alleged constitutional errors did not affect the overall length of the prisoner's confinement; success in the § 1983 action would not necessarily result in an earlier release from incarceration, and the § 1983 suit did not intrude upon the core or "heart" of habeas jurisdiction.  Ramirez, 334 F.3d at 852, 858.

The court in Ramirez went further and considered the related question of the extent of habeas corpus jurisdiction, expressly stating that its holding "also clarifies our prior decisions addressing the availability of habeas corpus to challenge the conditions of imprisonment."  334 F.3d at 858.  The court reviewed the decisions in Bostic v. Carlson and Neal v. Shimoda and concluded as follows:

> Our decision in Neal v. Shimoda, 131 F.3d 818 (9th Cir.1997), illustrates the importance of measuring the likelihood that a suit under § 1983 will affect the length of the prisoner's confinement. In Neal, two state prisoners filed suits under § 1983 alleging that they were classified as sex offenders in violation of the Due Process and Ex Post Facto guarantees. Id. at 822-23. Among other harms, both inmates argued that the classification affected their eligibility for parole. Id. We held that Heck did not require the inmates to invalidate their classification before bringing suit under § 1983, because a favorable judgment "will in no way guarantee parole or necessarily shorten their prison sentences by a single day." Id. at 824. The prisoner suits did not seek to overturn a disciplinary decision that increased their period of incarceration. Rather, a successful § 1983 action would provide only "a ticket to get in the door of the parole board." Id. A favorable judgment, therefore, would not "undermine the validity of their convictions," or alter the calculus for their possible parole. Id.
>
> Neal makes clear that under Preiser habeas jurisdiction is proper where a challenge to prison conditions would, if successful, necessarily accelerate the prisoner's release. Thus, Neal accords with our holding here that habeas jurisdiction is absent, and a § 1983 action proper, where a successful challenge to a prison condition will not necessarily shorten the prisoner's sentence.

Ramirez, 334 F.3d at 858-59.

Thus, habeas jurisdiction might be predicated on some conditions claims affecting parole if there is a sufficient nexus to the length of imprisonment or a sufficient likelihood of affecting the overall length of a prisoner's confinement.  Docken v. Chase, 393 F.3d at 1030-31.  However, the court has emphasized that measurement of the likelihood will result in an absence of habeas

5

jurisdiction where the challenge will not necessarily shorten the overall sentence.  Ramirez, 334 F.3d at 859.  In Ramirez, expungement of the disciplinary action was not shown to be likely to accelerate eligibility for parole; rather, success there would have meant only an opportunity to seek parole from a board that could deny parole on any ground already available to it.  Thus, the suit did not threaten to advance the parole date.  Id. at 859.

Effective January 1, 1983, the California legislature added new § 2933 to the California Penal Code,  eliminating the prior credit-earning system and instituting a new system of "work-time" credits for performance in work assignments and educational programs up to a maximum of one day reduction in term for each day of performance.  70 Ops. Cal. Atty. Gen. 49 (1987).  However, § 2933 applies *only* to persons sentenced under Penal Code §1170.  Persons convicted under § 1170 are those convicted of an offense for which the specified sentence is one of three time periods of imprisonment in state prison.  Cal. Pen. Code § 1168.

2.   Habeas Jurisdiction Exists In This Case As To Grounds Four Through Nine.

Here, Petitioner is serving a determinate ten-year sentence pursuant to a conviction in the San Bernardino County Superior Court.  (Doc. 1, p. 18).  Because Petitioner was sentenced to a determinate prison term, he is subject to the "work-time" credits under § 2933.  Petitioner has alleged he was wrongfully validated as a gang member and thereafter placed in the Secure Housing Unit ("SHU").  (Doc. 1).  Pursuant to 15 C.Cal.Reg. § 3043.4(b), "An inmate who is placed in SHU…upon validation as a prison gang member or affiliate is ineligible to earn credits pursuant to section 2933 or 2933.05 during the time he or she is in the SHU…."  Petitioner alleges that, as a direct result of being placed in the SHU pursuant to his gang validation, he has lost, at the time of filing of the petition, 450 days' of credits that extended his release date from August 8, 2011 to November 21, 2012.  (Doc. 1, p. 54).  Respondent's motion to dismiss does not contradict this allegation.

Thus, by even the most cursory of analyses, a direct correlation between the allegedly unlawful administrative decision to validate Petitioner and place him in the SHU, on the one hand, and Petitioner's potential loss of work-time credits while in the SHU, on the other, can easily be made.

6

Put simply, a sufficient nexus exists between Petitioner's claims attacking Respondent's administration decision to validate Petitioner and incarcerate him in the SHU and the length of imprisonment or a sufficient likelihood of affecting the overall length of a prisoner's confinement exists to justify habeas jurisdiction.  Docken v. Chase, 393 F.3d at 1030-31.  Unlike many cases where no habeas jurisdiction is found because the effect of losing credits for an inmate serving an indeterminate sentence, and who is also past his or her minimum eligible parole date, on the point when the inmate is granted parole is simply too speculative to justify habeas jurisdiction, here the correlation between lost credits and Petitioner's determinate sentence is both direct and proximate. Compare Burton v. Adams, 2010 WL 703182 (E.D. Cal. Feb. 25, 2010)(no habeas jurisdiction for claim of wrongful gang validation because, as a "lifer," petitioner's loss of credits would not affect the length of his sentence), with Corral v. Gonzalez, 2010 WL 3069244 (E.D. Cal. Aug. 3, 2010)(withdrawing recommendation of dismissal for lack of habeas jurisdiction because petitioner serving determinate prison term established that loss of credits resulting from gang validation affected length of his sentence).

However, such a nexus exists only for claims challenging the lawfulness of  Respondent's administrative decisions regarding SHU placement, either standing alone or as a consequence of gang validation, since SHU placement is the trigger for Petitioner's loss of work-time credits, which, in turn, is the sole factor that potentially affects the length of Petitioner's sentence.  Claims that do not have a meaningful correlation to Respondent's administrative actions placing Petitioner in the SHU are necessarily unrelated to Petitioner's potential loss of credits and are therefore factors too attenuated from the length of Petitioner's sentence  to justify habeas jurisdiction.

Here, in addition to Petitioner's challenges to the lawfulness of Respondent's gang validation and SHU placement, Petitioner raises three claims alleging that Respondent's administrative decisions were motivated by revenge and were retaliatory, thus violating Petitioner's First Amendment rights: (1) ground one alleges that Respondent placed Petitioner in the SHU in "retaliation for his grievance activities"; (2) ground two alleges that SHU placement was "in retaliation for [Petitioner's] political

1   writings, innocent correspondence, speech, poetry, drawings, and possession of African-American

2   historical literature"; and (3) ground three alleges Respondent confiscated "Petitioner's political

3   writings, correspondence, speech, poetry, drawings, and/or African-American historical literature."

4   (Doc. 1, p. 45).

5      The facts underlying these three claims have no bearing on the length of Petitioner's sentence,

6   focus exclusively on the conditions of Petitioner's confinement, do not in any way implicate the

7   "core" of habeas corpus, and are, accordingly, insufficient to trigger habeas jurisdiction.

8      However, even if the Court had jurisdiction, Petitioner's claims regarding the First Amendment

9   would have no merit.  In considering a claim based on a prison rule or regulation restricting a

10  prisoner's First Amendment rights, the Court applies the factors set forth in Turner v. Safley, 482 U.S.

11  78, 89, 107 S.Ct. 2254 (1987); see also Johnson v. California, 543 U.S. 489, 510, 125 S.Ct. 1141

12  (2005)(noting that prison regulations that restrict a prisoner's First Amendment rights are not

13  unconstitutional if they are reasonably related to legitimate penological interests).  The prison rule or

14  regulation "must be found reasonable in light of four factors: (1) whether there is a 'valid, rational

15  connection' between the regulation and a legitimate government interest put forward to justify it;  (2)

16  'whether there are alternative means of exercising the right that remain open to prison inmates'; (3)

17  whether accommodation of the asserted constitutional right would have a significant impact on guards

18  and other inmates; and (4) whether ready alternatives are absent (bearing on the reasonableness of the

19  regulations)."  Pierce v. County of Orange, 56 F.3d 1190, 1209 (9th Cir. 2008)(citing Turner, 482 U.S.

20  at 89-90).

21     It is clear that prison officials have "a legitimate penological interest in stopping prison gang

22  activity." Bruce v. Ylst, 351 F.3d 1283, 1289 (9th Cir. 2003).  While Petitioner may quarrel with

23  Respondent's conclusion that Petitioner's written materials are probative of gang affiliation, he cannot

24  reasonably dispute that such a conclusion is, at the least, a permissible inference from all of the

25  evidence presented by Respondent.  Under such circumstances, Petitioner's allegations of a First

26  Amendment violation are altogether insufficient to raise a reasonable inference that prison rules that

27

28
                      8

1  permit prison officials to sequester a validated gang associate with other validated gang members are

2  not reasonably related to a legitimate penological interest.

3      Accordingly, the Court concludes that it has jurisdiction to proceed as to ground four through

4  nine, but not as to grounds one, two, and three.   That being the case, the Court will recommend that

5  Respondent's motion to dismiss for lack of habeas jurisdiction be granted as to grounds one, two, and

6  three, but denied as to grounds four through nine.

7      C.   The Remaining Claims In The Petition Should Be Denied On Their Merits.

8      Even though the Court may have habeas jurisdiction to address grounds four through nine, the

9  Court has concluded that Petitioner is not entitled to relief on those claims.  Petitioner's remaining six

10 claims fall into two categories: claims four through eight allege violations of Petitioner's federal due

11 process rights vis-a-vis the manner in which Respondent made the gang validation determination and

12 subsequent SHU placement, while ground nine alleges a violation of Petitioner's Eighth amendment

13 privilege against cruel and unusual punishment.

14      1.   Standard of Review Under the AEDPA.

15     A petition for writ of habeas corpus under 28 U.S.C. § 2254(d) will not be granted unless the

16 petition can show that the state court's adjudication of his claim:

17      (1) resulted in a decision that was contrary to, or involved an unreasonable application of,
        clearly established Federal law, as determined by the Supreme Court of the United States;
18       or

19      (2) resulted in a decision that "was based on an unreasonable determination of the facts in light
        of the evidence presented in the State court proceeding.

20

21 28 U.S.C. § 2254(d);  Lockyer v. Andrade, 538 U.S. 63, 70-71 (2003);  Williams v. Taylor, 529 U.S.

22 at 412-413.

23     The first prong of federal habeas review involves the "contrary to" and "unreasonable

24 application" clauses of 28 U.S.C. § 2254(d)(1).  This prong pertains to questions of law and mixed

25 questions of law and fact.  Williams v. Taylor, 529 U.S. at 407-410;  Davis v. Woodford, 384 F.3d

26 628, 637 (9th Cir. 2004).  A state court decision is "contrary to" clearly established federal law "if it

27

28

9

applies a rule that contradicts the governing law set forth in [the Supreme Court's] cases, or "if it confronts a set of facts that is materially indistinguishable from a [Supreme Court] decision but reaches a different result." Brown v. Payton, 544 U.S. 133, 141 (2005), citing Williams v. Taylor, 529 U.S. at 405. A state court decision involves an "unreasonable application" of clearly established federal law "if the state court applies [the Supreme Court's precedents] to the facts in an objectively unreasonable manner." Brown v. Payton, 544 U.S. at 141; Woodford v. Visciotti, 537 U.S. 19, 24-25 (2002).

Consequently, a federal court may not grant habeas relief simply because the state court's decision is incorrect or erroneous; the state court's decision must also be objectively unreasonable. Wiggins v. Smith, 539 U.S. 510, 511 (2003) (citing Williams v. Taylor, 529 U.S. at 409). In Harrington v. Richter, 562 U.S. ___ , 131 S.Ct. 1388 (2011), the U.S. Supreme Court explained that an "unreasonable application" of federal law is an objective test that turns on "whether it is possible that fairminded jurists could disagree" that the state court decision meets the standards set forth in the AEDPA. If fairminded jurists could so disagree, habeas relief is precluded. Richter, 131 S.Ct. at 786. As the United States Supreme Court has noted, AEDPA's standard of "contrary to, or involv[ing] an unreasonable application of, clearly established Federal law" is "difficult to meet," because the purpose of AEDPA is to ensure that federal habeas relief functions as a "'guard against extreme malfunctions in the state criminal justice systems,'" and not as a means of error correction. Richter, 562 U.S. ___, 131 S.Ct. at ___(slip op. at 12-13)(quoting Jackson v. Virginia, 443 U.S. 307, 332, n. 5 (1979)(Stevens, J., concurring). The Supreme Court has "said time and again that 'an *unreasonable* application of federal law is different from an *incorrect* application of federal law.'" Cullen v. Pinholster, 131 S.Ct. 1388, 1410-1411 (2011). Thus, a state prisoner seeking a writ of habeas corpus from a federal court "must show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility of fairminded disagreement." Richter, 562 U.S. ___, 131 S.Ct. at ___(slip op. at 13).

Moreover, federal "review under § 2254(d)(1) is limited to the record that was before the state court that adjudicated the claim on the merits." Cullen, 131 S.Ct. at 1398 ("This backward-looking language requires an examination of the state-court decision at the time it was made.  It follows that the record under review is limited to the record in existence at the same time–i.e., the record before the state court.")

The second prong of federal habeas review involves the "unreasonable determination" clause of 28 U.S.C. § 2254(d)(2).  This prong pertains to state court decisions based on factual findings. Davis v. Woodford, 384 F.3d at 637, citing Miller-El v. Cockrell, 537 U.S. 322 (2003).  Under § 2254(d)(2), a federal court may grant habeas relief if a state court's adjudication of the petitioner's claims "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Wiggins v. Smith, 539 U.S. at 520; Jeffries v. Wood, 114 F.3d at 1500 (when reviewing a state court's factual determinations, a "responsible, thoughtful answer reached after a full opportunity to litigate is adequate to support the judgment").  A state court's factual finding is unreasonable when it is "so clearly incorrect that it would not be debatable among reasonable jurists." Id. ; see Taylor v. Maddox, 366 F.3d 992, 999-1001 (9th Cir. 2004), cert.denied, Maddox v. Taylor, 543 U.S. 1038 (2004).

The AEDPA also requires that considerable deference be given to a state court's factual findings.  "Factual determinations by state courts are presumed correct absent clear and convincing evidence to the contrary, § 2254(e)(1), and a decision adjudicated on the merits in a state court and based on a factual determination will not be overturned on factual grounds unless objectively unreasonable in light of the evidence presented in the state court proceedings, § 2254(d)(2)." Miller-El v. Cockrell, 537 U.S. at 340.  Both subsections (d)(2) and (e)(1) of § 2254 apply to findings of historical or pure fact, not mixed questions of fact and law. See Lambert v. Blodgett, 393 F.3d 943, 976-077 (2004).

To determine whether habeas relief is available under § 2254(d),  the federal court looks to the last reasoned state court decision as the basis of the state court's decision. See Ylst v. Nunnemaker,

11

501 U.S. 979, 803 (1991); Robinson v. Ignacio, 360 F.3d 1044, 1055 (9th Cir. 2004). Where the state court decided the petitioner's claims on the merits but provided no reasoning for its decision, the federal habeas court conducts "an independent review of the record...to determine whether the state court [was objectively unreasonable] in its application of controlling federal law."  Delgado v. Lewis, 223 F.3d 976, 982 (9th Cir. 2002); see Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003). "[A]lthough we independently review the record, we still defer to the state court's ultimate decisions." Pirtle v. Morgan, 313 F.3d 1160, 1167 (9th Cir. 2002).   Where the state court denied the petitioner's claims on procedural grounds or did not decide such claims on the merits, the deferential standard of the AEDPA do not apply and the federal court must review the petitioner's 's claims de novo.  Pirtle v. Morgan, 313 F.3d at 1167.

The prejudicial impact of any constitutional error is assessed by asking whether the error had "a substantial and injurious effect or influence in determining the jury's verdict."  Brecht v. Abrahamson, 507 U.S. 619, 623 (1993); see also Fry v. Pliler, 551 U.S. 112, 119-120 (2007)(holding that the Brecht standard applies whether or not the state court recognized the error and reviewed it for harmlessness).  Some constitutional errors, however, do not require that the petitioner demonstrate prejudice.  See Arizona v. Fulminante, 499 U.S. 279, 310 (1991); United States v. Cronic, 466 U.S. 648, 659 (1984).  Furthermore, where a habeas petition governed by the AEDPA alleges ineffective assistance of counsel under Strickland v. Washington, 466 U.S. 668 (1984), the Strickland prejudice standard is applied and courts do not engage in a separate analysis applying the Brecht standard.  Avila v. Galaza, 297 F.3d 911, 918 n. 7 (9th Cir. 2002);  Musladin v. Lamarque, 555 F.3d 830, 835 (9th Cir. 2009).

2.  Due Process.

a.  CDCR Policies Regarding Gang Validation and SHU Placement.

Because of the long-standing gang problem in California prisons, each institution has a gang coordinator or investigator ("IGI") and the CDCR has a gang suppression unt under the authority of the assistant director of the Law Enforcement and Investigation Unit ("LEIU").  The IGI unit for each

institution works to identify gang members or affiliates.  Cal.Code Regs. 15, § 3378(c).  Before an

inmate is identified as a gang associate, the IGI must have three or more independent sources of

information "indicative of association with the validated gang members or associates."  Cal.Code

Regs. 15, § 3378(c)(4).

Such information may include a statement from another inmate, an inmate's own admission,

tattoos, written materials, photographs, observation by staff, and information from other agencies.  The

regulations provide that the IGI unit can consider statements from informants only if their information

is independently corroborated or the informant is otherwise known as reliable.  Cal.Code Regs. 15, §

3321(b)(1).

Once an inmate has been validated as a gang member and placed in the SHU, he must be free

of any gang activity for at least six years before he may be considered for release.  Cal.Code Regs., §

3341.5(c)(5) & 3378(e).  However, if an inmate chooses to "debrief," i.e., admit his gang affiliation,

identify other gang members, and reveal all he knows about gang structure, he will be relased from the

SHU at the end of the debriefing process.  Cal.Code Regs. 15, § 3378.1(d).  An inmate placed in the

SHU receives periodic reviews, at intervals of 180 days, for consideration of release to general

population.  Cal.Code Regs. 15, § 3341.5(c)(2)(A).

b.   Petitioner's Gang Validation.

On April 8, 2010, the IGI Unit concluded an investigation into the prison gang activities of

Petitioner and identified him as being affiliated with the prison gang known as the Black Guerilla

Family ("BGF") who used the moniker "T-90."  (Doc. 1, p. 105).  Respondent determined that, as a

consequence, Petitioner's continued placement in the general inmate population endangered the

security of the prison as well as other inmates.  (Id.).  Petitioner was therefore ordered confined in the

SHU.  (Id.).

On April 9, 2010, Petitioner was interviewed regarding the documents used by the IGI unit in

its investigation.  (Doc. 1, p. 167).  In an April 9, 2010 memorandum from Assistant Institutional

Gang Investigator Turmezei, the latter indicated that Petitioner provided a written rebuttal addressing

13

1   all documents used in the validation process and that, as a result of Petitioner's rebuttal, which

2   challenged one of the source items, "the source item was further investigated and determined that one

3   of the notes evidencing activity did not pertain to [Petitioner] and was therefore removed from

4   submittal for validation." (Id.).  After a thorough review of all other items used in the investigation,

5   the IGI Unit concluded "there is sufficient evidence to validate [Petitioner]…as an associate of the

6   Black Guerrilla Family (BGF) prison gang." (Id.).  The matter was then forwarded to the Office of

7   Correctional Safety ("OCS") for review and acceptance of Petitioner's validation. (Id.).  On May 17,

8   2010, Petitioner was formally validated as a member of the BGF.  (Doc. 1, p. 72).

9          Petitioner subsequently filed administrative appeals at the Second Level and at the Director's

10   Level, both of which were denied.  (Doc. 1, p. 62; 157).  Petitioner filed a habeas corpus petition in the

11   Kern County Superior Court on April 8, 2011, that was denied on April 22, 2011.  (Doc. 1, p. 173).  In

12   summarizing the evidence supporting a gang validation, including the six sources used by Respondent

13   to support the allegation, the Superior Court explained its decision as follows:

14          These sources range from written communication to an inmate Joe Mater aka Gugu Valentine,
       to gang symbols depicting George Jackson and a guerilla in a magazine considered to be
15       training material.  One symbol depicted an African American prisoner breaking the chains of
       an officer.  It is commonly required for members or associates of the Black Guerilla Family to
16       be knowledgeable  of the history of the Black Guerilla Family movement and its founder,
       George Jackson.

17          Another source is revoluationary writings confiscated March 22, 2010 and summarized in a
18       memo dated April 6, 2010.  Other training material containing a to page historical overview of
       the Black Guerilla Family along with another symbol depicting George Jackson was
19       confiscated on March 25, 2010….

20          Petitioner contends that this evidence is being taken out of context.  He is an avid reader of
       many biographies, but denies knowing anything about prison gangs, or George Jackson prior to
21       purchase of his biolgraphy,  He obtained many of these books prior to his entry in prison along
       with his My Space entries, one of which depicts his photographs of gang associates and
22       himself together.

23          …

24          Given the prevalence of gang activity in prison, it is necessary to examine the complete picture
       and not take each source in isolation…There is a compelling state interest narrowly tailored to
25       achieve an important penal interest to decrease and control gang violence and maintain prison
       security.  That is why a link to training material for groups such as the Black Guerilla Family is
26       established here in light of the short history and the depictions of George Jackson and

27

28                                                    14

emphasis of highlighted materials for its members.  Such training material is not permissible.  There need be no rules violation to sustain a gang validation.

Given the nature of petitioner's present conviction, he needed to be circumspect with the materials he either brought into, or had sent to prison.  This is because harmless material outside of prison is considered harmful within prison walls if, as here, the prison establishes a link to gang activity.  The court notes that symbols and written communications are also useable sources to sustain a gang validation.  There need be only three independent sources to sustain the gan validation….Even absent the relevant written material, there are sufficient sources to sustain the gan validation.  As such, placement in segregated housing is necessary to preserve prison security.

(Doc. 1, pp. 172-174).

After the Superior Court denied his habeas petition, Petitioner filed a petition for writ of habeas corpus with the California Supreme Court that was denied on September 14, 2011.  (Doc. 1, p. 209).

### c.  Due Process Concerns For Gang Validation And SHU Placement.

The Due Process Clause of the fourteenth Amendment protects persons against deprivations of life, liberty, or property.  Wilkinson v. Austin, 545 U.S. 209, 221, 125 S.Ct. 2384 (2005).  Those who seek to invoke the procedural protections of the Due Process Clause must first establish that one of these interests is at stake.  Id.  "A liberty interest may arise from the Constitution itself…, or it may arise from an expectation or interest created by state laws or policies."  Id.

The Supreme Court has held that "the Constitution does not give rise to a liberty interest in avoiding transfer to more adverse conditions of confinement."  Id. at 222 (citing Meachum v. Fano, 427 U.S. 215, 225, 96 S.Ct. 2532 (1976)).  However, the Court also has held that "a liberty interest in avoiding particular conditions of confinement may arise from state policies or regulations, subject to the important limitations set forth in Sandin v. Conner, 515 U.S. 472, 115 S.Ct. 2293 (1995)."  Id., Such interests generally are limited to "freedom from restraint which…imposes atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life."  Sandin, 515 U.S. at 484.

In Sandin, the Supreme Court found no liberty interest protecting against a thirty-day assignment to segregated confinement because it did not "present a dramatic departure from the basic conditions of [the inmate's] sentence."  Sandin, 515 U.S. at 483; cf. Cato v. Rushen, 824 F.2d 703,

15

1    705 (9th Cir. 1987)(initial confinement in administrative segregation on the basis of little, even

2    unsubstantiated information, does not create objectionable condition.)

3         In Wilkinson, the Supreme Court addressed whether Ohio prisoners had a liberty interest

4    protected by the Fourteenth Amendment in not being assigned to the state's "supermax" prison.

5    Wilkinson, 125 S.Ct. at 2394-95.  The Court found that because the following conditions imposed

6    "atypical and significant hardship…in relation to the ordinary incidents of prison life," Ohio prisoners

7    did have such a liberty interest:

8         For an inmate placed in OSP, almost all human contact is prohibited, even to the point that
          conversation is not permitted from cell to cell; the light, though it may be dimmed, is on for 24
9         hours; exercise is for 1 hour per day, but only in a small indoor room.  Save perhaps the
          especially severe limitations on all human contact, these conditions likely would apply to most
10        solitary confinement facilities, but here there are two added components.  First is the duration.
          Unlike the 30-day placement in Sandin, placement at OSP is indefinite and, after an initial 30-
11        day review, is reviewed just annually.  Second is that placement disqualifies an otherwise
          eligible inmate for parole consideration.  [Cite omitted.] While any of these conditions
12        standing alone might not be sufficient to create a liberty interest, taken together they impose an
          atypical and significant hardship within the correctional context.

13

14   Id.[1]

15        What process is constitutionally due to an inmate placed in segregation depends on whether the

16   placement is disciplinary or administrative.  Toussaint v. McCarthy, 801 F.2d 1080, 1099 (9th Cir.

17   1986).  In Bruce v. Ylst, 351 F.3d 1283, 1287 (9th Cir. 2003), the Court of Appeals determined that

18   California's policy of placing suspected gang members in segregation is an administrative decision,

19   undertaken to preserve order in the prison.  When an inmate is placed in segregation for administrative

20   purposes, due process requires only the following procedures:

21        Prison officials must hold an informal nonadversary hearing within a reasonable time after the

22   prisoner is segregated.  The prison officials must inform the prisoner of the changes against the

23   prisoner oor their reasons for considering segregation.  Prison officials must allow the prisoner to

24

25   ────────────────
     [1] The record presently before the Court is insufficient for the Court to make a factual determination whether the conditions
26   in the specific SHU in which Petitioner is incarcerated are "atypical" enough, i.e., similar to those found in Wilkinson to
     create a liberty interest, to invoke the Due Process Clause.  However, assuming, without deciding, that they are,
27   Petitioner's Due Process claims are nonetheless without merit for the reasons set forth in the following section.

28                                                  16

1   present his views…[D]ue process [  ] does not require detailed written notice of charges,

2   representation by counsel or counsel-substitute, an opportunity to present witnesses, or a written

3   decision describing the reasons for placing the prisoner in administrative segregation.

4   Toussaint, 801 F.2d at 1100-1101.

5          In the gang validation context, an inmate is entitled to another layer of informal procedures.

6   Before being removed from the general population, the inmate must "receive some notice of the

7   charges against him and an opportunity to present his views to the prison official charged with

8   deciding whether to transfer him to administrative segregation."  Hewitt v. Helms, 459 U.S. 460, 476,

9   103 S.Ct. 864 (1983).  When an inmate is validated as a gang member, the actual decision to segregate

10  is made by the IGI.  Toussaint v. McCarthy, 926 F.2d 800, 803 (9th Cir. 1990); see also Madrid v.

11  Gomez, 889 F.Supp. 1146, 1276 (N.D. Cal. 1995)(the critical decision maker is the IGI).

12  Accordingly, before his transfer to segregation, Petitioner was entitled to an "informal hearing with the

13  IGI.  Id.

14                  d.   Petitioner Was Not Denied Due Process.

15         Alleging violations of his federal due process rights, grounds four through nine raise the

16  following due process claims: (4) Petitioner was prevented from presenting evidence central to his

17  defense; (5) failure of Respondent to follow its own regulations, i.e., the "single source" rule; (6)

18  failure to provide Petitioner with adequate notice as to what conduct was prohibited; (7) confiscation

19  of Petitioner's drawings without proper notification; and (8) Respondent's rules and regulations are:

20  vague, overbroad, unreasonable, fail to give inmates notice of the prohibited conduct, lack clarity for

21  enforcement purposes and delegate unbridled discretion to low-level prison employees, do not require

22  subsequent review, and do not afford the same due process protections to inmates in the SHU.  (Doc.

23  1, pp. 46-47).  For the reasons set forth below, the Court concludes that none of these claims have

24  merit.

25         Applying the due process standards set forth in the preceding section, it is obvious that

26  Petitioner has received all of the due process due for an inmate segregated in the SHU and/or validated

27

28                                              17

1   as a gang member or affiliate.  As the chronology set forth earlier explains, Petitioner was promptly

2   notified of the decision to place him in the SHU, he was permitted to rebut allegations that he was a

3   gang affiliate or member, he was permitted to administratively appeal those decisions to higher prison

4   officials, and he was able to review the evidence presented against him.  Petitioner does not contradict

5   any of these facts.  Although Petitioner may wish to have been afforded more comprehensive due

6   process rights, he is not entitled to them and Respondent is not derelict for failing to provide more than

7   what federal law requires.

8       Petitioner also contends that Respondent prevented Petitioner from presenting his own

9   evidence to rebut the charge of a gang affiliation.  Specifically, Petitioner contends that he asked

10  prison officials to allow him access to his personal belongings in order to point out to them evidence in

11  his possession that would contradict the gang affiliation allegation; however, Petitioner maintains,

12  prison officials refused him access to such evidence and failed to afford him an opportunity to make a

13  verbal explanation of the evidence used against him.  (Doc. 1, pp. 21-23).  Petitioner also maintains

14  that prison authorities "skewed" evidence and took evidence out of context to support their claim that

15  Petitioner was affiliated with a gang.  (Id., pp. 21-25).  Significantly, Petitioner does not dispute that

16  he was given an opportunity to review the evidence against him and that he was afforded the

17  opportunity to present a written rebuttal to that evidence.  (Id., p. 29).  Again, in his opposition to the

18  motion to dismiss, Petitioner argues that he was precluded from presenting evidence favorable to him;

19  however, Petitioner refers the Court back to the portions of the petition referred to above as proof that

20  he was not allowed to present exculpatory evidence.

21      From the foregoing, it is apparent that Petitioner has failed to indicate what evidence he would

22  have presented on his behalf or to establish that such evidence, even if presented, would have had any

23  impact on the ultimate determination vis-à-vis gang affiliation.  To the contrary, Petitioner repeatedly

24  makes conclusory statements that he has such evidence, without informing the Court as to the nature

25  or relevance of that evidence.  Moreover, Petitioner does not dispute the authenticity of the evidence

26  presented against him; rather, he contends that Respondent took such evidence out of context or

27

28                                    18

"skewed" it to support its claims. Petitioner does not, however, explain how Respondent's interpretation of the evidence was skewed or taken out of context.   In other words, Petitioner disagrees not with the evidence itself, but with the inferences and conclusions drawn from that evidence.  Moreover, Petitioner does not deny that he was given an opportunity to present his side of the issue, albeit in the form of a written statement.  In sum, Petitioner's claim is utterly devoid of particulars that would permit the Court to seriously examine a potential deprivation of federal due process based on preventing Petitioner from presenting evidence in his own defense.

Next, Petitioner argues that California's regulations regarding gang validation are unconstitutionally vague because no reasonable person could understand what items are permissible in prison and what items would be suggestive of gang affiliation.  (Doc. 1, pp. 40-41).  Specifically, Petitioner contends that nothing in the regulations indicates that historical literature, biographies, and the like, which, in themselves, are permissible, could be used to support a gang validation.  Petitioner argues that the regulations must be sufficient precise to permit him to determine whether possession of certain items would be probative of gang affiliation.

A statute is only unconstitutionally vague if it "fails to give adequate notice to people of orginary intelligence" what conduct is prohibited by the statute.  <u>Melugin v. Hames</u>, 38 F.3d 1478 (9th Cir. 1994); <u>see also Coates v. City of Cincinnati</u>, 402 U.S. 611, 614, 92 S.Ct. 1686 (1971).  The flaw in Petitioner's reasoning is that the regulations seek to curtail gang affiliations and activities within the prison system, not the possession of specific items.  The regulations do not, like most criminal laws, ban specific conduct as a crime; rather, they provide procedures by which prison officials can administratively categorize and segregate gang affiliates from the general population to further prison safety concerns.  It would be impossible for California's regulations to specify every instance, every piece of literature, every document, or every type of conduct by inmates that Respondent might, in some future validation proceeding, consider to be evidence of gang affiliation.  In the Court's view, it is sufficient that the regulations put inmates on notice that their association with other prison gang

affiliates is prohibited and will be sanctioned if proven, either through evidence of an inmate's conduct and/or his possession of gang-related paraphernalia or materials.

Finally, in a similar argument to the preceding one, Petitioner claims that some materials in his possession that were used by Respondent as evidence of his gang affiliation were originally sent to him with the blessing of prison officials.  This argument, too, carries little weight.  Under California law, there need be no rules violation to sustain a gang validation.  In re Furnace, 185 Cal.App.4th 649, 660 (Cal.App. 2010).  In light of the State's interest in curtailing gang violence and activities in prison, permitting Petitioner to possess political literature that, in itself, is not contraband, but that may, along with other evidence, suggest a gang affiliation, simply does not rise to the level of a constitutional violation. [2]

3.  Cruel and Unusual Punishment.

Petitioner next contends that his Eighth amendment privilege against cruel and unusual punishment has been violated because (1) Petitioner was falsely validated and placed in the SHU without a sufficient basis or sufficient evidence; (2) Petitioner was maliciously subjected to the harsh conditions of the SHU; (3) Petitioner was deliberately mis-validated, thereby endangering Petitioner's life; and (4) Respondent required Petitioner to have a gang cellmate, which placed Petitioner's safety in danger.  (Doc. 1, p. 47).  Again, the Court concludes that this contention is without merit.

The Eighth Amendment protects prisoners from "cruel and unusual punishment."  U.S. Const. amend. VIII.  To constitute cruel and unusual punishment in violation of the Eighth Amendment, prison conditions must involve "the wanton and unnecessary infliction of pain…."  Rhodes v. Chapman, 452 U.S. 337, 347, 101 S.Ct. 2393 (1981).  Although prison conditions may be restrictive and harsh, prison officials must provide prisoners with food, clothing, shelter, sanitation, medical care,

---

[2] Petitioner's argument that Respondent violated the "single source" rule is equally unavailing.  Although the Court has been unable to locate the legal authority for the purported "single source" rule, i.e., that a single gang-related incident or conduct shall constitute one source item only, assuming, arguendo, that it is correct, Petitioner has alleged only that one source item was separated into two distinct source items.  (Doc. 1, p. 37).  Even if this were true, Petitioner was validated on the basis of five other sources.  As the Superior Court noted in rejecting Petitioner's habeas petition, only three sources are required per California regulations.  (Doc. 1, p. 174).

and personal safety.  Id.; Toussaint v. McCarthy, 801 F.2d 1080, 1107 (9th Cir. 1986); Hoptowit v. Ray, 682 F.2d 1237, 1246 (9th Cir. 1982).

Prison officials have a duty to take reasonable steps to protect inmates from physical abuse. Hoptowit, 682 F.2d at 1250-1251; Farmer v. Brennan, 511 U.S. 825, 833, 114 S.Ct. 1970 (1994).  To establish a violation of this duty, the inmate must establish that prison officials were deliberately indifferent to a substantial risk of serious harm to the inmate's safety.  Farmer, 511 U.S. at 834.  The deliberate indifference standard involves an objective and a subjective prong.  First, the alleges deprivation must be, in objective terms, "sufficiently serious…."  Id. at 834.  Second, the prison official must "know[ ] of and disregard[ ] an excessive risk to inmate health or safety…."  Id. at 837.

Here, Petitioner's claims that Respondent falsely, deliberately, and maliciously mis-validated him, thereby subjecting Petitioner to the harsh conditions of the SHU, are merely duplicative of Petitioner's due process arguments, which this Court has already rejected supra.  To the extent that Petitioner is challenging the determination of gang affiliation itself, Petitioner does not make a persuasive case that the Eighth Amendment provides either a separate constitutional analysis or greater relief than does the Fourteenth Amendment.

However, to the extent that Petitioner contends that by requiring Petitioner to have a cellmate from a prison gang to which Petitioner claims he does not belong, his personal safety is in jeopardy, he does, at first blush, implicate the Eighth Amendment.  Farmer, 511 U.S. at 837.  However, having already determined that sufficient evidence was presented to support Respondent's determination that Petitioner was affiliated with the BGF, Petitioner cannot now argue that requiring him to cell with another member of that same gang would represent a threat to his personal safety.  Thus, the Court rejects any claim that Respondent's actions violate the Eighth Amendment.

///
///
///
///

21

**RECOMMENDATION**

Accordingly, the Court HEREBY RECOMMENDS as follows:

    1.    That the motion to dismiss for lack of jurisdiction (Doc. 12), be **GRANTED** as to grounds one, two, and three, but **DENIED** as to the remaining grounds for relief; and,

    2.    That the petition for writ of habeas corpus be **DENIED** with prejudice on its merits as to the remaining grounds for which the Court has jurisdiction.

This Findings and Recommendation is submitted to the United States District Court Judge assigned to this case, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 304 of the Local Rules of Practice for the United States District Court, Eastern District of California.

Within twenty (20) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) <u>court</u> days after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order. <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **July 12, 2012**               **/s/ Jennifer L. Thurston**
                                       UNITED STATES MAGISTRATE JUDGE